KENNETH ROBINSON, AN INFANT BY HIS PARENT AND GUARDIAN *AD LITEM*, ERNESTINE ROBINSON, *ET ALS.*, PLAINTIFFS-RESPONDENTS, v. WILLIAM T. CAHILL, GOVERNOR OF THE STATE OF NEW JERSEY, *ET ALS.*, DEFENDANTS-APPELLANTS.

January 23, 1975.

## ORDER

On April 3, 1973 this court filed its opinion (62 *N. J.* 473) in the above captioned cause (which constituted its judgment, *R.* 2:11–3(b)) modifying the judgment of the Superior Court, Law Division, Hudson County and affirming said judgment as so modified. Said opinion generally held that the present system of maintaining and supporting public elementary and secondary school education in this state is unconstitutional because it does not conform to the state's obligation imposed by Art. VIII, § 4, par. 1 of the New Jersey Constitution. The court reserved decision on the subject of remedies and sought the further views of the parties. After receiving the same, it filed a further opinion on June 19, 1973 (63 *N. J.* 196), concluding as follows:

\* \* \* It is our view that the Court should not disturb the statutory scheme unless the Legislature fails to enact, by December 31, 1974, legislation compatible with our decision in this case and effective no later than July 1, 1975. We withhold ruling upon the question whether, if such legislation is not so adopted, the Court may order the distribution of appropriated moneys toward a constitutional objective notwithstanding the legislative directions.

We retain jurisdiction. Any party may move for appropriate relief, before or after December 31, 1974, if new circumstances so warrant.

No such legislation was enacted by December 31, 1974, although efforts to that end continued through said date. The matter therefore now returns to this court for the ordering of appropriate remedies to effectuate the court's original decision.

The above numbered motions have been filed with sundry objects. Some seek injunctions with respect to, and/or redistribution of, some or all of such funds as may be appropriated by the Legislature as various forms of state aid to local school districts for the school year commencing July 1, 1975 (none have yet been appropriated); others seek leave to intervene or to participate as *amici curiae* to present their views thereon and still others seek action on miscellaneous matters.

Upon consideration of all said motions and the briefs and accompanying documents, it is on this 23 day of January, 1975, determined and ordered as follows:

1. The motion of defendants The President of New Jersey Senate and the New Jersey Senate for a rehearing of the case (M–475) is denied. The motion of defendants Speaker of the General Assembly and the General Assembly (M–521) for order in aid of judgment is denied.

2. The motions of petitioners Christiansen, et als. "for an extension of time of thirty (30) days to allow petitioners to intervene and to file a petition for rehearing" (M–453 and 454) are denied.

3. All school districts must, even under recent legislation extending timetable dates, commence within a very few days the process of adopting budgets for the school year 1975–76, arranging for elections and attending to other matters relevant thereto and must be advised prior thereto of the amount of state aid funds of various categories estimated to be received during said school year. Any injunction against the distribution of said funds, or part thereof, and/or any redistribution of the same, on a different basis than now prescribed by law, while benefitting the local property tax situation in some municipalities, would in the

case of many others radically increase the amount to be raised by local taxation or require substantial reduction of the educational program. The fact that there will be. no legislation compatible with the court's decision became certain only a very short time ago and the court considers it would be inequitable and, indeed, chaotic as to many school districts to effect financial changes for the 1975-76 school year at this late date and on such short notice. Therefore, the court will order no changes in the present statutory scheme for the school year 1975-76 and defendant Commissioner of Education may immediately advise all school districts of the amount of estimated state aid funds for said year based on present law.

4. Consequently, plaintiff's motion for relief (M-448), alternate motion for relief (M-449) and second alternate motion for relief (M-450) are denied and motion of defendant Governor Brendan T. Byrne (successor to defendant William T. Cahill) for order in aid of judgment (M-452) is denied. No further motions for relief need be filed by any party. Plaintiffs' motion for discovery (M-451) is denied without prejudice to renewal if the subject matter becomes relevant at a later date.

5. The court will hear oral argument on March 18, 1975 at 10:00 A.M. on the following subjects as related to relief with respect to the school year commencing July 1, 1976 and years thereafter:

a. The method of determination of the definition of "a thorough and efficient system of free public schools," of the translation of that definition into financial terms and of the application thereof (including whether such definition should be administratively applied to each school district separately, to groups of districts based on particular characteristics or equally to all).

b. The extent of the power of the court to order relief from, or changes in, the present statutory financing scheme on a temporary or permanent basis in order to assure the

meeting of the state's obligation to implement such system as defined.

c. To what extent and in what particular ways the court should exercise such power.

d. Whether the court should appoint a special master, to hear the views of the parties, including especially those of defendant Commissioner of Education and defendant State Board of Education, and the *amici curiae* and receive from the parties any evidence deemed relevant, and to make recommendations to the court as to said definition and its application, the power of the court, and its exercise, in order that a final determination as to remedies may be made by the court in sufficient time that every school district may know by October 1, 1975 what the state aid situation will be as to it, as far as practicable, for the school year 1976-77.

6. In order that said oral argument may be of manageable proportions in view of the large number of parties and movants for intervention or participation as *amici curiae,* the court will hear oral argument only on behalf of the following:

a. the named parties, *i. e.,* the plaintiffs by one attorney; the Governor *pro se* or by his attorney; the President of the Senate and the Senate by one attorney; the Speaker of the General Assembly and the General Assembly by one attorney; the Attorney General for the Commissioner of Education, the Department of Education and the State Board of Education;

b. those *amici curiae* who have previously participated in oral argument herein who may wish to be heard and so advise the Clerk;

c. the following present petitioners who are hereby granted permission to participate as *amici curiae*:

(1) New Jersey School Boards Association, by one attorney (M–463);

(2) New Jersey Education Association, et als., by one attorney (M–476);

(3) The following school districts or municipalities claiming to be substantially injured by any redistribution of state aid funds: Township of Livingston (M–470); Montclair, Berkeley Heights, Chatham Township, New Providence, Rumson, Sandyston-Walpack and Summit (M–474); Millburn (M–498); Avon-by-the-Sea and Belmar (M–499); Englewood and the City of Englewood (M–511); *Morris School District* (M–512); *Lyndhurst* (M–514); Mendham Township (M–522), and Mayor of the Borough of Carlstadt (M–523), by one attorney to be selected by the attorneys, for said districts (in the absence of such agreement, there will be no oral argument on behalf of such districts).

7. All the persons, organizations and entities named in paragraph 6 hereof may, if desired, file and serve on all other parties and *amici curiae* briefs additional to those already on file by February 24, but limited to the subjects set forth in paragraph 5 hereof. Any briefs in reply thereto shall be filed and similarly served by March 3.

8. Any member or members of the Senate or General Assembly in disagreement with the position taken by counsel for those bodies may, *pro se* or through attorney, file and serve upon the same persons and by the same date, briefs and statements of his, her or their views upon the same subjects, all in accordance with paragraph 7 hereof. The motions of petitioners Russo, et als. (M–513) and Greenberg, et als. (M–515) are granted to such extent.

9. The motions of the following, to the extent only of the allowance of participation as *amici curiae,* are granted, limited to the filing of briefs on the same basis as set forth in paragraph 7 hereof: City of Newark (M–432); Pleasantville Taxpayers Association, et als. (M–469); New Jersey Education Reform Project of the Greater Newark Urban Coalition (M–471).

10. All motions to intervene as a party or otherwise participate are denied except to the extent hereinbefore set forth.

11. No further applications for intervention or participation will be considered.

For the Court:

*Chief Justice*

Jan. 23, 1975

Justice PASHMAN disagrees with certain portions of the decretal part of the above order and is filing a memorandum stating his views.

PASHMAN, J. (dissenting). The exceptional character of this case and my strong disagreement with the majority impels me to take the extraordinary step of filing a formal dissenting opinion from the memorandum order of the Court insofar as that order denies all relief for the 1975-76 school year. I do so reluctantly and with full appreciation of the desirability of consensus among the members of the Court when it acts in matters of great public import.

I disagree with paragraph 5 of the order of the Court in that it fails to set out with specificity the issues to which the parties ought to address their arguments. Without intending to limit the freedom of said parties to present any issues they deem proper, I am listing those matters which I think should have been included in the order:

1. Should the Court seek by its remedial orders to implement the education clause directly or, alternatively, seek to induce the Legislature to do so?

2. Can the Court enjoin payment of some or all State funds appropriated as aid to education until the Legislature complies with the constitutional mandate? If it can, should it do so?

3. Can the Court issue a specific mandatory injunction to the Legislature ordering compliance with the education clause? If it can, should it do so?

4. What does the constitutional mandate that the State maintain a thorough and efficient system of free public schools mean? What does it require as to the financing of said system?

5. If the Court decides to implement the education clause in the absence of legislative action, who should devise the working plan for allocation of revenues?

6. Can the Court redistribute some or all moneys appropriated as State aid for public schools? If it can, should it do so?

7. Can the Court impose a State-wide property tax? If it can, should it do so?

8. Can the Court require some or all taxes raised locally for educational purposes to be paid into the Court (or State Treasury) for redistribution? If it can, should it do so?

9. Can the Court require some or all school districts to increase local tax rates to provide additional funds to be redistributed to achieve a thorough and efficient system of education throughout the State? If it can, should it do so?

10. Can the Court order consolidation of school districts to equalize assessed valuation per pupil in each district? If it can, should it do so?

11. Who should administer the relief ordered by the Court?

12. The propriety of the Court allowing the State to achieve compliance with the education clause over a period of up to five years.

The posing of these issues is, of course, not intended to indicate a prejudgment as to their ultimate resolution.

On June 19, 1973, two months after our initial decision in this matter, we publicly declared our intention to obtain the implementation of a plan for compliance by the State with the requirements of the education clause of the Constitution of 1947, *N. J. Const.* (1947), Art. VIII, § 4, ¶ 1, by July 1, 1975. *Robinson v. Cahill,* 63 *N. J.* 196, 198 (1973). This period of time seemed more than ample in view of the magnitude of the injustice being suffered by the children of this State and their parents as the result of the inequities of the existing system of educational finance. It should be noted that the Legislature had already been on notice since January 1972, when Judge Botter announced his opinion in this matter, *Robinson v. Cahill,* 118 *N. J. Super.* 223 (L. Div. 1972),[1] that the system of educational finance was probably unconstitutional as well as being unfair.

Today we abandon that goal. I am unable to justify or excuse this decision, and I cannot join in it.

The majority fears that the grant of any affirmative relief for this school year would create chaos in the budgetary process in local school districts. It is undeniable that a grant of affirmative relief by the Court for this school year would complicate the process of approval of local school budgets this spring. That process is governed by the various provisions of *N. J. S. A.* 18A:22, which sets out a timetable for formulation and adoption of these budgets. The Legislature, however, has already pushed the timetable back for this year. *L.* 1974, *c.* 191. Even this revised schedule is not so tight as to preclude further compression, either by

---

[1]Indeed, the first judicial warnings of the possible unconstitutionality of the New Jersey system of educational finance came earlier still. *West Morris Regional Board of Education v. Sills,* 58 *N. J.* 464, 477 n. 7 (1971).

the Legislature,[2] or, in the absence of legislative action, by the Court itself. Oral arguments could be scheduled in mid-February and a decision announced shortly thereafter.

A certain amount of confusion and a great deal of dissatisfaction would undoubtedly result. The first can be ameliorated by diligence on the part of State and local officials. The second, the inevitable, discordant accompaniment to possible change, should play no part in our decision.

The real question is: Can this Court, consistently with its obligations to uphold and to enforce the Constitution, trade the constitutionally guaranteed rights of hundreds of thousands of children[3] to an equal educational opportunity for the possibility of avoiding some difficulties in meeting local budget-making deadlines. I do not see how this question can be answered in any way but in the negative.

I am not proposing that the Court could or should attempt by its remedial orders to achieve a root and branch reform of the system of school finance by July 1, 1975. Rather, I am convinced that we can make some significant, well-considered remedial responses this year to the constitutional problems we have identified. We have an affirmative duty to do so.

It is no ground for judical inaction that some measures proposed may be unpopular. *Ridgefield Park v. Bergen County Board of Taxation,* 31 *N. J.* 420, 431 (1960). It is no ground that there may be resistance to the orders of the Court, whether in local government or in the halls of

---

[2]Newspaper accounts this week report that legislative leaders are contemplating further modification of budget deadlines.

[3]The precise number of children affected cannot be determined on the present state of the record. The court below received testimony to the effect that while, as of 1972, $1,200 per pupil would be an appropriate amount of money for a school district to spend, 372,189 children were attending public schools in districts expending less than $900 per pupil. 118 *N. J. Super.* at 246.

I should note that expenditure per pupil is only part of the problem of equal educational opportunities.

the Legislature. *Cooper v. Aaron,* 358 *U. S.* 1, 78 S. Ct. 1401, 3 L. Ed. 2d 5 (1958). It is no ground that the fertile imagination can find or invent plausible excuses for delay. *See Jackman v. Bodine,* 44 *N. J.* 312 (1965). This Court has identified a profound violation of the Constitution. It has given the coordinate branch of government ample opportunity to take corrective action. It possesses the capacity to begin the process of remedying the violation. To fail to do so at this late date is to become a party to the perpetuation of the very wrongs which the Court denounced two years ago.

